884 F.2d 1392
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Debra S. DAMPHOUSE, et al., Plaintiffs-Appellants, Cross-Appellees,
v.
QUAKER OATS COMPANY, Defendant-Appellee, Cross-Appellant.
 No. 88-3779, 88-3860.
 United States Court of Appeals, Sixth Circuit.
 Sept. 19, 1989.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and HENRY R. WILHOIT, District Judge.*
 PER CURIAM.
 
 
 1
 This is an action for breach of an oral agreement to give the defendant employer's laid-off employees "first consideration" in the filling of new jobs. One of the plaintiffs also claimed that the company had refused to rehire her because of her filing of a workers' compensation claim.
 
 
 2
 The case was tried to the court (Richard McQuade, J.), sitting without a jury. The defendant moved for dismissal upon completion of the plaintiffs' presentation of their evidence, and the court granted the motion under Rule 41(b), Fed.R.Civ.P. Having concluded that the defendant was entitled to judgment as a matter of law, we shall affirm the dismissal without reaching the question whether, as plaintiffs claim, the case ought to have been tried to a jury.
 
 
 3
 * The plaintiffs are seven former hourly-paid employees at the Marion, Ohio plant of the Quaker Oats Company. The plaintiffs were laid off in the spring of 1985. Under the provisions of a collective bargaining agreement then in effect, laid-off employees could retain their seniority rights for a period of twenty-four months after lay-off.
 
 
 4
 The collective bargaining agreement covered a term ending on April 24, 1987. In January of that year the company began negotiating a successor agreement with Local 745 of the United Auto Workers Union. One of the topics on the negotiating agenda was preferential hiring rights for workers who had been laid off for more than 24 months. The company and the union reached an oral agreement on this subject, adopting a formula proposed by the company, but the agreement was not incorporated in the written collective bargaining agreement. The side-agreement was left out because it was viewed as a "one shot deal" to benefit only those currently in danger of losing their seniority status. There were some 30 people in that category.
 
 
 5
 As summarized in a handout distributed by the union at a meeting called to consider ratification of the new collective bargaining agreement, the oral side-agreement provided as follows:
 
 
 6
 "Until December 31, 1987, Company agrees to give first consideration for rehire to employees who lose their seniority due to being on lay off twenty-four (24) months. Those rehired will receive full seniority rights."
 
 
 7
 It is undisputed that among the potential beneficiaries of the side-agreement were four or five "bad eggs"--employees with unfavorable records--whom the company did not plan to rehire under any contingency. Union negotiator Hughes testified that although he did not know who these four or five people were, the union understood that they would not be brought back.
 
 
 8
 Soon after ratification of the new collective bargaining agreement, the company decided to expand its work force at the Marion plant because of the closing of a plant in Illinois. Twenty-six of the laid-off employees applied for jobs, as did over 2000 outsiders. The Ohio Bureau of Employment Services screened the outside applications and submitted 120 of them to the company. The Bureau did not screen the applications of the former employees.
 
 
 9
 The company conducted an extensive interview program, and interviews with former employees were scheduled first. Five former employees (presumably the "bad eggs") were not offered interviews; all of the 21 remaining former employee applicants received at least one interview, and 13 of the 21 were hired. About 16 outsiders were hired also. The plaintiffs, who were not hired, received letters from the company stating that "[a]fter carefully considering your work history, qualifications, and abilities, we feel that there are other candidates who are better suited to our present needs."
 
 
 10
 The plaintiffs' action was originally brought in the Court of Common Pleas of Marion County, Ohio. The case was removed to federal district court, where the company filed motions to strike the plaintiffs' jury demand and to dismiss the complaint.
 
 
 11
 The district court initially denied the motion to strike the jury demand, except as to the retaliation count, reasoning that although "[a]ctions brought pursuant to 29 U.S.C. Sec. 185 [Sec. 301 of the Labor Management Relations Act] are not entitled to a jury trial," the plaintiffs were entitled to a jury here because they had not sued under that statute. The court subsequently reversed itself on this, holding that the breach of contract claim was preempted by federal law because it asserted rights under a contract as defined by Sec. 301. The motion to dismiss was granted as to the retaliation claim, but was denied as to the breach of contract claim.
 
 
 12
 The case was tried to the court on July 27 and 28, 1988. At the conclusion of the plaintiffs' case, the defendant moved for dismissal under Rule 41(b). Judge McQuade granted the motion in a decision from the bench. He found that the words "first consideration," as used by the parties during their negotiations and memorialized by the union in the ratification handout, meant "simply, as the defendant contends, that we agree to examine the qualifications of these people first. And there is no other agreement." He concluded that the laid-off hourly employees had been given first consideration, and that was all they were entitled to. The plaintiffs perfected a timely appeal, and the defendant took a protective cross appeal.
 
 II
 
 13
 The plaintiffs argue that they had a right to a jury trial because their breach of contract action constituted an action at law, not a suit in equity. The defendant argues that the suit was equitable in nature because the plaintiffs asked for reinstatement, an equitable remedy, and hence the granting of trial by jury was discretionary. The parties also differ as to whether this is a hybrid breach-of-duty-of-fair-representation/Sec. 301 action, notwithstanding that the union was not sued; the resolution of this question might also affect the plaintiffs' right to a jury.
 
 
 14
 We need not decide whether the district court erred in not empaneling a jury, for on the record before us it seems clear that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The company obligated itself to give the laid-off employees "first consideration," and that is what it did. The company did not have to hire everyone (or, indeed, anyone) in the group that was to be considered first. See Utility Co-Workers Association v. Public Service Electric & Gas Co., 344 F.2d 102, 103 (3d Cir.1965) (Giving "first consideration" for secretarial positions to present employees means only that their qualifications are examined first.)
 
 
 15
 It is true that union negotiator Hughes referred to the oral agreement as one for "preferential hiring," testifying that "[w]e were going for the 30 months preferential hiring for one year based on past record and by their seniority." When asked what the union negotiators meant by "past record and seniority," however, he replied, "[t]hat would be that they would go back and look at their employment record to judge whether those people were good employees or not. They [the Company] said they wanted good people." In his mind, it is obvious, "preferential hiring" did not mean a guaranty of a job offer.
 
 
 16
 Contemporaneous notes on the negotiations shed this light on the nature of the company's "first consideration" proposal:
 
 
 17
 "SJ [Scott James, Employee Relations Manager] ... we are willing to commit to looking first at these people who break service during calendar 1987. This consideration would look at their past work history.
 
 
 18
 TE [Thomas Eckard, Union Chairman] What do you mean by first consideration
 
 
 19
 SJ We would look at them before going outside
 
 RH Would you contact them
 
 20
 SJ No, they would have to come to us."
 
 
 21
 The Company's pattern of hiring for the new jobs was totally consistent with this. As we have noted, 26 of the 30 former employees sent in job applications. Of the 26, the Company decided not to interview five; they were mailed rejection letters on July 22. The Company tried to schedule interviews with the remaining 21 candidates before it began interviewing outside candidates flagged by the Bureau of Employment Services. (It is significant that the laid-off employees had the advantage of not being required to go through Bureau screening.) Because of scheduling problems, five of the laid-off employees could not have their initial interviews until August 3; the others were interviewed before that date. With only one exception, all of the successful outside candidates had their initial interviews on or after August 3.
 
 
 22
 Seven of the 21 former employees received job offers without having to submit to a second interview. Nine were asked back for a second interview, and six of these were hired. All of the second interviews for former employees were conducted before second interviews were accorded any of the outside candidates who were ultimately successful. All 13 of the former employees who were rehired started work at least ten days before any of the newly hired outsiders did.
 
 
 23
 The Company went to some lengths to see that the former employees completed both the first and second stage of the hiring process before their outside counterparts, and the rate of hire for former employees--13 out of 26 applicants--was far better than the rate of hire (16 out of 2,000) for outside applicants. The fact that some former employees were not rehired hardly suggests that they did not receive "first consideration" within the meaning of the agreement.
 
 
 24
 With regard to the claim of retaliation against the employee who had filed for workers compensation benefits, we agree with the district court that no triable issue of fact was presented. In view of our disposition of the case, we need not address the issues raised by the defendant on its cross appeal.
 
 
 25
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Henry R. Wilhoit, United States District Judge for the Eastern District of Kentucky, sitting by designation